## WINTHROP *vs.* CURTIS.

Construction of the limits of the *Plymouth* patent.

A grant of a tract of land extending " *the space of fifteen miles on each side of Kennebec river,*" is to be located in such a manner as that every point in the exterior line shall be exactly fifteen miles from the *nearest* point of the river.

THIS action, which was a writ of right, was in effect a contest between the Proprietors of the *Kennebec* purchase, demandants, and the *Pejepscot* Proprietors, tenants, concerning the western limits of the *Plymouth* patent, so called.

This patent bore date *Jan.* 16, 1629, and was a grant from the Council of *Plymouth* to *William Bradford* and his associates, of " all that tract of land or part of *New England* in *America* afore- " said, within or between, and extendeth itself from the utmost " limits of *Cobbiseconte*, alias *Comaseconte*, which adjoineth to the " river of *Kennebec*, alias *Kennebekike*, towards the western ocean, " and a place called the falls, at *Neguamkike* in *America* afore- " said, *and the space of fifteen English miles on each side of the said* " *river, commonly called the Kennebec river*, and all the said river " called *Kennebec*, that lies within the said limits and bounds " eastward, westward, northward, or southward last abovemen- " tioned, and all lands, grounds, soils, rivers, waters, fishings, " situate, lying and being, arising, happening or accruing in or " within the said limits and bounds, or either of them," &c.

The lower, or foot line of this tract, was established by compact between the *Kennebec* and the *Pejepscot* proprietors by their division-deed dated *Feb.* 20, 1758, to run—" beginning at the " mouth of *Cathance* river, which empties itself into Merry-" meeting-bay, *said line to run a west-north-west course* until it meets "with the western line of the *Kennebec* purchase as it extends " north and south, and which is fifteen miles from *Kennebec* " river," &c.

It appeared that the *Kennebec* proprietors by their grant to *William Vassal*, *Oct.* 9, 1771, conveyed a tract of land on the west side of *Kennebec* river, bounded, " beginning on that branch of " *Cobbeseconte* stream that issues out of the great pond, and at " the east end of the northerly line of lot numbered twenty two, " from thence running on said northerly line *a west-north-west course* " ten miles, or to the western boundary line of the *Kennebec* pur-" chase," &c. It was understood that this ten miles commenced five miles on a course west-north-west from the river, and that the proprietors had laid off their other lots in that direction ;— and that this course was nearly or quite at right angles with the general course of the river.

The *Kennebec* proprietors had also accepted a deed from the agents of the Commonwealth of *Massachusetts* dated *Feb.* 18, 1789, confirming to them the Commonwealth's right to a tract of land, bounded, " beginning at the *Kennebec* river in the north line " of *Woolwich*, thence easterly on that line, and on the same " course fifteen miles, thence northerly *keeping the distance of* " *fifteen miles from the river*, till it meets with a line drawn due " east from the mouth of *Wesserrunset* river, at the distance of " fifteen miles from *Kennebec* river ; thence due west five miles ; " thence north three miles ; thence west thirty miles, crossing " *Kennebec* river, and exclusive of the width thereof ; thence " due south three miles ; thence south forty five degrees east, " until it meets a line on the western side of *Kennebec* river, " *running parallel with the general course thereof and fifteen miles* " *therefrom* ; thence running southerly, *keeping the width of fifteen* " *miles from said river*, to a line drawn from said river at right " angles with the general course thereof, coinciding with and " passing through the utmost limits of *Cobbesconte* towards the

"western ocean ; thence in the line last mentioned easterly to "Kennebec river ; thence in a direct line to the first mentioned "bounds."

There had also been an agreement between the agents of the Commonwealth and those of the Kennebec proprietors, June 26, 1789, conformably to which agreement instructions were given to Ephraim Ballard, a surveyor appointed to run the line, "until you meet a line on the western side of Kennebec river "parallel with the general course of the river last mentioned, and "keeping the distance of fifteen miles therefrom."

And the line was described in similar language in another agreement between the same parties dated Feb. 18, 1799.

A verdict had been taken for the demandant, subject to the opinion of the whole Court as to the construction of the grant. This question was argued at September term 1822, and the cause continued under advisement till this term.

Orr and R. Williams, for the demandant.

Longfellow, Greenleaf, and Fessenden, for the tenant.

For the tenant it was argued,—1st. That by the terms of the grant, it was the manifest intent of the parties to grant a tract of land thirty miles wide and no more, one half of which was to lie on each side the river.

2. That there must be a point on the river, above which the grant does not extend ; and consequently a head line to the grant; and the course of this head line must also be the course of every other line of admeasurement from the river to the exterior boundary of the grant.

3. That the Kennebec proprietors had given their own grant a practical construction, having established a boundary and courses with a view of conforming to it, by which they were therefore bound. Makepeace v. Bancroft 12 Mass. 409. This was proved by the location of their lots ;—by the releases between them and the Pejepscot proprietors ;—by their grant to Vassal ;—by their deed from the Commonwealth of Feb. 18, 1789 ;—and by their subsequent agreements with the agents of the Commonwealth.

And the lines thus established agree sufficiently with the courses " eastward and westward" mentioned in the grant.

4 That upon any other construction, a line fifteen miles from the mouth of *Wesserunsett* river cannot reach the line claimed by the grantees, by more than a mile. And the line thus claimed, being a curve-line, is impracticable.

5. That the exterior side lines of the grant should therefore be run parallel to the general course of the river, measuring from the river always by a west-north-west and an east-south-east course.

6. That the authorities which seem to countenance an admeasurement of fifteen miles from *every* point of the river, thus giving the grantees a tract of nearly fifty miles wide, instead of thirty,— were cases of grants from the King or Commonwealth, subject to another rule of construction; and not, like the present, a mere deed of conveyance between private persons.

*For the demandant* it was replied,—1st. That the question had formerly been settled in his favor by the Supreme Judicial Court of *Massachusetts* in case not reported, brought by the *Pejepscot proprietors v. Bishop,* a copy of which was produced and read.

2. That the adoption of a west-north-west course was not binding on the *Kennebec* proprietors, it being arbitrarily assumed for the mere purpose of settling a dispute between them and their neighbors, and not as any limitation of their rights under the grant.

3. That the words of the original grant are as full and ample as could be used, to convey all the land within fifteen miles of *any part* of the river. If the grant *alone* be inspected, it contains no indication of any specific course by which the admeasurement from the river should be made. And if the rule contended for by the tenant is adopted, the words of the original grant will not be satisfied, because the " space" will not be " fifteen English miles on each side the river."

4. So far as the doings of the Commonwealth can affect the question, they are in favor of the demandant. Their agreement with the proprietors, and the instructions to their surveyor were, *to keep the distance of fifteen miles from the river* ; which he could

never have done upon the construction contended for on the other side.

And the construction adopted by the demandants is the settled construction in New-York in similar cases. *Jackson v. Williams* 2 *Johns.* 297, and *Williams in error v. Jackson* 5 *Johns.* 489, 504. *Jackson v. Dennis* 2 *Caines* 177.

WESTON J. The demandants in this action move for a new trial on account of a misdirection of the Judge in a matter of law to the jury ; by which they were instructed that " if they believ- " ed the demanded premises were within fifteen miles of *Kenne-* " *bec* river, measuring in *any* direction, or on any point of compass " from the river, they ought to find their verdict for the deman- " dants." It appears from the evidence reported by the Judge, that the demanded premises are within fifteen miles of *Kennebec* river, measuring in one direction ; but that they are not within fifteen miles of the river, measuring upon a west-north-west course.

It is conceded that the land of the proprietors of the *Kennebec* purchase extends fifteen miles from the river, on each side ; and that the determination of this cause will depend upon the course upon which this distance of fifteen miles is to be measured.

The counsel for the demandants contend that it is to be ascertained by measuring in any direction, from any part of the river within their limits. On the other side it is insisted that this distance is to be ascertained by measuring at all points, at right angles with the general course of the river, which, as the counsel for the tenant assume, would require an admeasurement upon a west-north-west course. And they insist that their position is supported by the true construction of the original title of the demandants ; by their actual grants and locations ; by their deeds of release to the *Pejepscot* proprietors, ascertaining a part of the southerly line of their claim; and by the adjustment made between them and the Commonwealth of *Massachusetts*, by which their title was confirmed within certain limits.

We are met at the threshold of this controversy by a decision of the Supreme Judicial Court of *Massachusetts*, in the case of the *Pejepscot* proprietors, under whom the present tenant claims, and

Winthrop *v.* Curtis.

*Zadock Bishop*, cited by the demandant's counsel, but not to be found in the reports, which they contend, determines the question in favor of the demandants. Upon examining the case cited, as reported by the Judge who presided at the trial, it appears that the tenant claimed under the proprietors of the *Kennebec* purchase ; that the land in dispute would not be included within their claim, measuring the fifteen miles upon a west-north-west course; but that it was within fifteen miles of the river measuring upon a course at right angles with the river, and probably meaning according to its direction at the place from which the admeasurement was made. The Judge instructed the jury that the proprietors of the *Kennebec* purchase had a right to extend their grant fifteen miles from the river, to be measured on a course at right angles with the river in every part ; and that if they believed that the land in dispute lay within fifteen miles of the river, measuring in any direction, they must find their verdict for the tenant, which they accordingly did. To this opinion and direction of the Judge the demandants excepted, and moved for a new trial on account of a misdirection in a matter of law. This motion having been argued in the county of *Kennebec,* and having been continued *nisi*, the Supreme Judicial Court, at *November* term 1819, in *Middlesex*, directed the clerk of the county of *Kennebec* to enter upon the docket of the preceding term of that county that the motion for a new trial was overruled, and ordered judgment to be rendered upon the verdict.

From the record and proceedings in the case cited, it would seem that the whole Court sustained the opinion given by the Judge to the jury ; but the counsel for the tenant in this action having produced a letter from one of the Judges of that Court, stating that no general principle of construction was settled, or intended to be settled in that cause, I have deemed it suitable and proper to go into a full consideration of the general question raised between these parties.

It may tend to a more satisfactory elucidation of the question, to consider, first, upon what principles the claim of the demandants ought to be settled, independent of any actual locations made, or agreements entered into, by them ;—and secondly, how far their rights may have been affected by such locations or agreements.

The original grant from the council established at *Plymouth,* of the lands now claimed by the proprietors of the *Kennebec* purchase, after fixing the points in *Kennebec* river above and below, to and from which it was limited, extended it for " the space of fifteen English miles on each side of the said " river, commonly called the *Kennebec* river, and all the said " river called the *Kennebec* that lies within the said limits and " bounds, eastward, westward, northward and southward."

The difficulty in ascertaining the extent of the grants on each side of the river, arises from the winding and serpentine course which rivers and streams are uniformly found to pursue.

By measuring the fifteen miles at every point, at right angles with the general course of the river, upon the hypothesis contended for by the counsel for the tenant, the two side lines would very nearly correspond with the particular course of the river in all its parts, and the end lines would be at right angles with the general course, and parallel with each other.

The lines ascertained in this manner would embrace about the same quantity of land which the grantees would have been entitled to, had the river proceeded in a straight line between the points to which their grant is limited ;—and if we assume that the distance between these points in a straight line is twenty miles, but that as the river runs it is twenty five miles ; this rule of construction requires that a given space projected from a meandering line of twenty five miles would embrace no more land than would be included in the same space projected from a straight line of twenty miles. It is demonstrable, however, that if you pass the end of a line of the given space in length, along the meandering base, and, without withdrawing it in any part therefrom, with the opposite end mark an exterior line, keeping the measuring line always upon an inclination which will give such exterior line its greatest extension ; the land embraced will be much more than the same measuring line would include, extended in the same manner along the straight base. And from every point in the exterior line you would reach the winding base in the given distance, and from every point in the same base you would reach the exterior line in the given distance, in some one direction.

The position in favor of the tenant's mode of admeasurement, the force of which I have felt most strongly, is—that every rod in the given base, which is the river, should determine the location of the same space in each of the exterior lines ; the only practicable way of doing which would seem to require his construction. But the land conveyed was to extend the space of fifteen miles on each side of the river, which is equivalent to saying that it is thus to be extended from the whole and every part of each side. If therefore, extended from some points in the river, the line of fifteen miles would not include so much land as if extended from other points ; yet, as all points are equally given, I can perceive nothing which would preclude the grantees from measuring from such points as would be most favorable to them. And upon a full consideration of the question submitted, I am of opinion that the terms of the grant are best satisfied by extending it so as to embrace all the land which can be found within fifteen miles of the river, measuring from any point, in any direction, not above or below the points of limitation.

With regard to the end lines of the grant or patent, it appears to me that they should be formed by an admeasurement at right angles with a straight line extended between the points within which the grant is limited ; or, in other words at right angles with the general course of the river. For the grantees are entitled to no land above or below these points of limitation ; and whether land be above or below these points will depend on the direction in which they lie in relation to each other. The general construction before given is supported by the case of the *Pejepscot* proprietors against *Bishop* ; although, for the reasons before stated, I have not considered that case as decisive of the present. I have not been able to find, among the reported cases of *Massachusetts*, any one which has presented a question like that raised between the parties before us. In *New-York*, the true location of grants of a determinate breadth, extending along a river or stream, has frequently been submitted to their judicial tribunals ; and in one instance, the Courts there were called on to determine the construction of a grant extended for a given distance around certain plains, and which was considered as presenting the same question, in principle. In the case of *Jackson*

*v. Lunt* 2 *Caines* 363, *Staat's* patent was under consideration; which was to run up the *Hudson* as the river runs, from a certain point, two hundred chains; thence up into the woods, north-west, twenty chains, to the mountain; thence along said mountain, parallel with *Hudson's* river, to a certain rivulet, thence down that rivulet to the place of beginning. *Spencer* J. in delivering the opinion of the Court, observed that in running a line parallel with a river, it is only requisite that the distance where that is to control should be such that the river in some one point is not further off than is required. In other words, the west line of *Staats'* patent, without reference to the mountain, if run parallel with the general course of the river, might in some places be at a greater distance than the twenty chains, and yet be correctly run.

In *Williams v. Jackson,* before the Court for the correction of errors, 5 *Johns.* 489, the location of the *Hoosack* patent was in controversy, which extended for two miles on each side of *Hoosack* creek. *De Witt Clinton,* senator, in delivering his opinion, in which a majority of the Court concurred, states that "the mode "now adopted by the State, and considered the only practicable "one in cases like the present, is to run the bounds so that every "point in them shall be exactly the given distance from the point "nearest to it in the creek or river." The same rule prevailed in the location of the *Catskill* patent, 5 *Johns.* 440, which was to extend four English miles from five great plains of an irregular figure. It seems therefore that the construction upon which the demandants rely, and which appears to me to be the true one, is in conformity with that which prevails in *New-York.*

It remains to consider whether the proprietors of the *Kennebec* purchase have done any thing in their locations, or in their agreements with the owners of adjoining tracts, impairing their right to the full benefit of this construction. They have located their lots uniformly, it is said, upon a west-north-west and an east-south-east course; which, it is contended, is at right angles with the general course of the river. As these lines would be parallel with their end lines, there was a manifest propriety and convenience in this location; and I can perceive nothing in it which can have any tendency to curtail their western boundary. Nor

can I discover that their western line was limited or restricted by their deed of release in 1758 to the *Pejepscot* proprietors. By that deed a part of their southern boundary was to run " a west-"north-west course, until it meets with the westerly line of the " *Kennebec* purchase as it extended north and south, and which " is fifteen miles from said *Kennebec* river." In legal construction, this line would run a west-north-west course to the westerly line of the *Kennebec* patent, as a monument, wherever that might be, whether exceeding or falling short of fifteen miles. And although that line is represented as being fifteen miles from the river, yet that representation would be true in fact, if it was found to be so, measuring in any direction.

The adjustment between the proprietors of the *Kennebec* purchase and the Commonwealth of *Massachusetts*, was a matter of compromise and compact ; to which the *Pejepscot* proprietors, under whom the tenant claims, were neither parties nor privies. But if it were otherwise, and we were now called upon to settle the demandant's claim upon the principles of that adjustment, I am not aware that the limits of the *Kennebec* purchase would be curtailed by it. By the release from the *Commonwealth*, the westerly line of the *Kennebec* purchase, within the limits of their original patent, was to keep the distance of fifteen miles from the river, and that, upon a true construction, as we have seen, would not be done, if any point in that line approached nearer than fifteen miles to any point in the river.

Upon the whole, it appears to me that the demandants are entitled to judgment on the verdict ; and I am authorised to say that Judge *Preble* concurs in the result of this opinion.

Note. The Chief Justice, having formerly been of counsel for one of the parties, did not sit in this cause.